IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN   DIVISION

| | | |
|---|---|---|
| GARY McMICKLE, on behalf of himself and others similarly situated, | * * * | |
| Plaintiff | * * | |
| VS. | * * | |
| ARKANSAS TELEPHONE COMPANY, on behalf of itself and a defendant class of rate-of-return rural telephone companies that received proceeds of redemption of shares of stock in the Rural Telephone Bank, | * * * * * * | NO: 4:08CV00324   SWW |
| Defendant | * * | |

### ORDER

Plaintiff Gary McMickle ("McMickle") brings this putative class action, claiming that he and proposed class members are entitled to share in proceeds received by rural telephone companies in connection with the liquidation of the Rural Telephone Bank.  Before the Court is a motion to dismiss by  Defendant Arkansas Telephone Company ("ATC") (docket entry #14), McMickle's response in opposition (docket entry #20), and ATC's reply (docket entry #24). After careful consideration, and for the reasons that follow, ATC's motion will be granted, and the case will be dismissed with prejudice.

### I. Background

The nation's telephone network generally consists of two parts: (1) local exchange carriers ("LECs") that provide the network infrastructure within a local area, including wires

running to customers' homes, and (2) long-distance carriers that provide the infrastructure needed to transport calls between local networks. Long-distance carriers pay fees or "access charges" to LECs for the use of local network connections that are needed to complete long-distance telephone calls.

*Access Charge Regulation*

After the breakup of AT&T in the early 1980's, the Federal Communications Commission ("FCC") instituted a rate-of-return system for regulating LECs' access charges.[1] Under rate-of-return regulation, LECs are permitted to recover interstate revenue requirements, as determined by the reasonable and necessary cost of providing interstate access service, plus a rate of return on invested capital. Interstate revenue requirements are computed according to the following formula: ((Rate Base) x (Rate of Return)) + Expenses, with the rate base equal to the interstate portion of capital used in providing interstate telecommunications. *See In re Amendment of Parts 65 and 69 of the Commission's Rules to Reform the Interstate Rate of Return Represcription and Enforcement Processes,* 10 F.C.C.R. 6788, 6791 (April 6, 1995). The rate for any given service equals its revenue requirement divided by the demand anticipated for that service. *See id.*

The FCC prescribes a maximum rate of return for LEC capital and adopts policies

---

[1] In the 1990's, the FCC adopted a price cap method for regulating access charges, aimed at providing incentives for LECs to cut costs and refrain from overinvestment. *See United States Telephone Ass'n v. F.C.C.*, 188 F.3d 521, 524 (C.A.D.C. 1999). Under price cap regulation, the FCC sets price or rate ceilings and generally allows LECs to retain profits earned. The price cap method is mandatory for the largest LECs and optional for others. According to the amended complaint allegations, Defendant Arkansas Telephone Company and the members of a proposed defendant class are "rural rate-of-return" LECs.

regarding the calculation of rate bases and the recognition of expenses.  *See In re Amendment of Part 65 of the Commission's Rules to Prescribe Components of the Rate Bases and Net Incomes of Dominant Carriers*, 2 F.C.C.R. 332, 332 (January 16, 1987).   Additionally, the Federal Communications Act of 1934 ("FCA") requires LECs to file with the FCC annual schedules or tariffs that show "all charges" for "interstate . . . wire . . communications services" and "the classifications, practices, and regulations affecting such charges."  *See* 47 U.S.C. § 203(a).   Each year, the National Exchange Carrier Association ("NECA"), as an agent of rate-of-return LECs, prepares and files a tariff that lists access charges for the following year for LECs that are members of the association.[2]   Tariff provisions set the rates for LECs and their customers, and LECs are prohibited from receiving greater or less compensation than specified in a tariff or refunding or remitting by any means or device any portion of charges specified in a tariff.  *See* 47 U.S.C. § 203(c).

FCC rules require that an LEC's interstate access earnings be measured over a two-year monitoring period to determine compliance with the maximum allowable rate of return.  *See* 47 C.F.R. §65.701.  An LEC may make access rate adjustments during the course of a two-year monitoring period to ensure that it does not exceed or fall short of its maximum allowable rate, *see* 47 C.F.R. § 69.3(b), and the Commission may require an LEC to change its rates prospectively.  *See* 47 U.S.C. §§  205, 208.

### *The Rural Telephone Bank*

In 1971, Congress established the Rural Telephone Bank ("RTB") to provide low-interest loans to LECs for building and operating telephone infrastructure in rural areas.   RTB obtained

---

[2] Defendant Arkansas Telephone Company is a member of the NECA.

capital by issuing three classes of stock: Class A, Class B, and Class C. *See* Def.'s Mot. Dismiss, Ex. #1 (Bylaws of the Rural Telephone Bank, August 2005, § 2.1). RTB issued Class A stock only to the United States in return for the initial taxpayer-provided capital that allowed the bank to begin lending. Class B stock was purchased by recipients of RTB loans, as a condition of receiving the loans, in an amount equal to 5% of the face value of the loan. *See* 7 C.F.R. § 1610.9. Class B stock paid no cash dividend, but holders received annual patronage refunds in Class B stock ("Patronage Class B" stock).[3] Class C stock, which earned a cash dividend, was available to RTB borrowers and organizations controlled by borrowers. Class C stock was also available through the conversion of Class B stock after the repayment of associated loans.

> In 1989, the FCC addressed the proper accounting treatment for Class B stock, stating:
>
> Because this stock represents investor-provided funds used as an operating investment, it should be included in the rate base consistent with our treatment of Rural Telephone Bank Stock in Section 36.172 of the Separations Manual.[4] Therefore, we amend Part 65 to make specific reference to this investment. However, we wish to remind carriers that any profit realized from the sale of the stock or from dividends should be included in Account 7160, Other Operating Gains and Losses, and thereby serve to benefit ratepayers.

---

[3] According to RTB Bylaws, the bank calculated patronage refunds as follows: At the end of each fiscal year, the bank transferred excess revenue (nominated "patronage capital assignable") to a reserve. Amounts in the reserve in excess of $10 million were transferred on a first in first out basis and allocated as Class B stock to borrowers holding Class B stock during the fiscal year the amounts were earned. The amount allocated to an individual Class B stockholder for a given fiscal year was based on the amount of interest revenue from the particular stock holder for the fiscal year compared to RTB's total interest revenue from all Class B stock holders for the same fiscal year. *See* Def.'s Mot. Dismiss, Ex. #1 (Bylaws of the Rural Telephone Bank, August 2005, § 8.2).

[4] Because the same telecommunications equipment is used for intrastate and interstate communications, carriers must apportion their costs through a "separations" process. *See* 47 C.F.R. §§ 36.1-36.3.

*In re Amendment of Part 65 of the Comm'n's Rules to Prescribe Components of the Rate Base and New Income of Dominant Carriers* ("1989 FCC Order"), 4 F.C.C.R. 1697, 1705 (1989).  In accordance with the FCC's order, and continuing prior practice, LECs included the par value of purchased Class B shares in the rate base when computing interstate revenue requirements.

In 1996, the Rural Utilities Service[5] ("RUS") issued uniform accounting procedures for RTB stock. *See Accounting Requirements for RUS Telecommunications Borrowers,* 61 FR 39844, 39845 (July 31, 1996). RUS addressed a proposal that income should be recognized at the time patronage refunds are allocated to the owners of Class B stock in order to insure that members of a telecommunications cooperative receive their fair share of the patronage refund. RUS rejected the proposal, responding: "Because the Class B . . . stock has no known market value, pays no return or interest, and cannot be alienated except in connection with the transfer of an outstanding RTB loan, the committee recommended that the patronage refunds be recorded as a memorandum entry on the books of an account until such time as the value of the stock is realized, in cash, through its redemption." *Id*. at 39845-46. Accordingly, when Patronage Class B shares were received by LECs, they were recorded as a memo entry and had no value in a rate base.

In 2005, RTB approved resolutions to liquidate and dissolve the Bank. In 2006, RTB redeemed all outstanding Class A, Class B, Patronage Class B, and Class C shares at par value, and in 2007, RTB made final distributions of approximately 4.435 cents per share to holders of

---

[5]In 1994, the Secretary of Agriculture established the Rural Utilities Service and assigned it responsibility for administering telecommunications loan and loan guarantee programs, including Rural Telephone Bank loans, previously administered by the Rural Electrification Administration. *See* 7 C.F.R. § 1700.1.

Class A and Class B shares.

In April 2006, the NECA issued a memorandum to its members stating the association's interpretation of FCC rules and orders regarding accounting for the RTB dissolution. *See* Def.'s Mot. Dismiss, Ex. #2. The memorandum states, "NECA plans to employ this treatment in its upcoming annual interstate tariff filing, which will be filed with the FCC in June of this year." *Id*., at 1. Regarding accounting procedures for Class B shares, the memo states that redeemed Class B shares previously included in the interstate rate base would be removed, and the pro-rata portion of gain above par value (if any) would be reflected as a reduction in revenue requirement. The memo further states that Patronage Class B stock received by borrowers should not be includable in the rate base, recognized as operating income, or reported in interstate cost studies as a reduction to the revenue requirement.

An NECA memorandum issued to the association's members on January 17, 2008 addresses the treatment of final distributions made to Class A and Class B shareholders. *See* Def.'s Mot. Dismiss, Ex. #4. Consistent with the April 2006 memo, the January 2008 memo states that the pro-rata portion of the distribution allocable to purchased Class B shares reduced the amount that LECs needed to recover in access charges that year and thus served to benefit ratepayers. However, the NECA treated distributions allocable to Patronage Class B shares consistently with the proceeds from the original redemption of Patronage Class B shares.

### *Plaintiff's Claims, Defendant's Motion to Dismiss*

McMickle brings this action on behalf of himself and a proposed class of persons who, from May 24, 1984 through June 30, 2006, were customers of LECs that received stock

redemption proceeds in connection with the liquidation of RTB.[6]  McMickle claims that he and the putative class members shouldered the financial burden of the LECs' equity investment in RTB stock because LEC access charges are ultimately borne by LEC customers via charges for long-distance telephone service.  McMickle contends that because he and the proposed class paid for access charges that included the cost of Class B stock, they are entitled to a portion of the "windfall profits" realized as a result of RTB's redemption of Patronage Class B shares.

McMickle seeks certification of (1) a defendant class that includes all rural, rate-of-return LECs that followed NECA's directions not to share the RTB stock redemption "windfall" with their customers and (2) a plaintiff class including customers of the proposed defendant class.  By way of relief, McMickle seeks, in the alternative: (1) a declaration that a substantial portion of the "windfall" received by the proposed defendant class belongs to the proposed plaintiffs; (2) an award of damages for the defendants' violation of the Federal Communications Act of 1934, specifically 47 U.S.C. § 201(b);[7] or (3) restitution of the portion of the "windfall" received by the defendant class that rightly belongs to the proposed plaintiff class.

The sole named Defendant, Arkansas Telephone Company ("ATC") seeks dismissal of this action, with prejudice, on the ground that McMickle's claims are barred by the filed-rate doctrine.  Alternatively, ATC asserts that the complaint should be dismissed without prejudice

---

[6]According to the complaint allegations, McMickle has been a customer of Defendant Arkansas Telephone Company for approximately 20 years.  *See* Amend. Compl., ¶ 9.

[7]Title 47 U.S.C. §201(b) requires that all charges, practices, classifications, and regulations for and in conjunction with interstate communications service be just and reasonable, and gives the FCC jurisdiction to enact rules to implement that requirement.  Title 47 U.S.C. § 207 authorizes any person "damaged" by a violation of § 201(b ) to bring a lawsuit to recover damages in federal court.

under the doctrine of primary jurisdiction.[8]

## II.  Standard of Review

Dismissal is proper under Rule 12(b)(6) of the Federal Rules of Civil Procedure where a plaintiff's complaint fails to state a claim upon which relief can be granted.  At this stage of the litigation, the court accepts as true all of the factual allegations contained in the complaint, and reviews the complaint to determine whether its allegations show that the pleader is entitled to relief.  *Bell Atlantic Corp. v. Twombly,* 127 S.Ct. 1955, 1964-65 (2007).  The court should dismiss under Rule 12(b)(6) "where the allegations show on the face of the complaint . . . some insuperable bar to relief."  *Benton v. Merrill Lynch & Co.,* 524 F.3d 866, 870 (8th Cir. 2008).[9]  The Court may grant a motion to dismiss on the basis of a dispositive issue of law.  *Neitzke v. Williams*, 490 U.S. 319, 326 (1989).

## III.  Discussion

*Filed-Rate Doctrine*

As a general rule, the filed-rate doctrine provides that once a federal agency determines the lawful rate for a service, that rate cannot be modified or avoided in the courts.  *See Arkansas*

---

[8] In the event that the Court finds that McMickle's claims should proceed, ATC seeks dismissal of McMickle's claims against the putative defendant class on the ground that McMickle lacks standing to sue entities that cause him no harm.

[9] When ruling on a Rule 12(b)(6) motion, the court must generally ignore matters outside the pleadings, *see Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999), and if a court considers evidence outside the pleadings, it must normally convert the motion into a summary judgment motion.  *See Mattes v. ABC Plastics, Inc.,* 323 F.3d 695, 698 (8th Cir. 2003).  However, the court may consider materials that are necessarily embraced by the complaint and materials that are part of the public record.  *Id.*  Here, the exhibits attached to ATC's motion to dismiss do not contradict the complaint allegations, and McMickle raises no objection to their submission.

*Louisiana Gas Co. v. Hall*, 453 U.S. 571, 573, 101 S. Ct. 2925, 2928 (1981).  One of the principles behind the doctrine is that, when Congress has committed ratemaking authority to a federal agency, courts cannot encroach upon this authority by permitting litigation that may contradict the lawful rate. *See id.* at 577-78, 101 S. Ct. at 2930-31. In addition to barring suits challenging filed rates and suits seeking to enforce rates that differ from the filed rates, the filed-rate doctrine also bars suits challenging services, billing, or other practices when such challenges, if successful, would have the effect of changing the filed tariff.  *See American Tel. and Tel. Co. v. Central Office Telephone, Inc*. 524 U.S. 214, 223, 118 S. Ct. 1956, 1963 (1998).

ATC argues that McMickle's claim challenges filed tariff rates for access charges paid from 1984 to 2006.  McMickle insists that he is not challenging filed rates and that his is a claim for "money had and received."

The Court finds that McMickle's claim, however stated, seeks relief for an injury caused by the payment of a filed rate.  Absent the allegation that McMickle paid a share of access charges levied by ATC, which originated from tariffs filed with the FCC and included the cost of Class B stock, he would have no conceivable claim to a share of the stock redemption proceeds. Whether viewed as a challenge to the reasonableness ATC's rates filed during the period when Class B stock was included in the rate base, or an attack on ATC's rates filed after RTB redeemed the stock,  McMickle's claim for damages would effectively change filed tariffs and infringe the FCC's authority to set uniform rates.

McMickle contends that his claim for damages would not involve the Court in judicial ratemaking and would only require application of the principles set forth in *Democratic Central Committee v. Washington Metropolitan Area Transit Commission*, 485 F.2d 786 (D.C. Cir.

1973), *cert. denied*, 94 S. Ct. 1451 (1974) ("Democratic Central").

In *Democratic Central*, the Court held, *in the absence of a regulatory rule governing the issue*, that capital gains realized from the sale of public utility assets should be apportioned between investors and ratepayer/consumers according to two guiding principles:  First, the right to capital gains is tied to the risk of capital losses, and second, in situations where it is difficult to ascertain who bears the risk of loss, "those who bear the financial burden of particular utility activity should also reap the benefits resulting therefrom." *Democratic Central*, 485 F.2d. at 808.

As previously noted, the FCC issued an order in 1989 stating that "any profit realized from the sale of [RTB] stock or from dividends should be included in Account 7160, Other Operating Gains and Losses, and thereby serve to benefit ratepayers."   1989 FCC Order, 4 F.C.C.R. 1697, 1705 (1989).  The FCC's order is consistent with the principles set forth in *Democratic Central* and with the FCC's policy that when ratepayers bear the financial burden of a carrier's activity, any resulting capital loss or gain should be included in the determination of net income for ratemaking purposes. *See In re Part 65 of the Commission's Rules to Prescribe Components of the Rate Bases and Net Incomes of Dominant Carriers*, 2 F.C.C.R. 332, 335 (Jan. 16, 1987)(quoting *Democratic Central Committee v. Washington Metro. Area Transit Comm'n,* 485 F.2d 786, 806 (D.C. Cir. 1973) ("In deciding that the gains should benefit ratepayers rather than being awarded to investors as extraordinary include, we remain guided by the principle that "the right to capital gains on utility assets is tied to the risks of capital losses.")

Furthermore, in June 2006, the NECA filed a tariff with the FCC showing that, consistent with the FCC's 1989 order, the association removed Class B shares previously included in the rate base, thereby reducing LECs' interstate revenue requirements. *See* docket entry #14, Ex. #3.

The NECA took the position that, in accordance with the FCC's order, Patronage Class B shares that were not previously included in the rate base were not reportable for interstate cost study purposes. Even assuming that the NECA's treatment of redemption distributions conflicts with the FCC's 1989 directive and the principles set forth in *Democratic Central*, McMickle's claims for monetary and declaratory relief challenge the NECA's treatment, and, if successful, would have the effect of changing filed tariffs. Accordingly, the Court finds that McMickle's claims are precluded under the filed-rate doctrine.

### *Doctrine of Primary Jurisdiction*

If McMickle's claims were not precluded under the filed-rate doctrine, the Court would agree that the case should be dismissed, without prejudice, pursuant to the doctrine of primary jurisdiction. The doctrine of primary jurisdiction is utilized in proper cases to coordinate judicial and administrative decision making, and it applies even when a claim is initially cognizable in federal court. *See Red Lake Band of Chippewa Indians v. Barlow*, 846 F.2d 474, 476 (8th Cir.1988); *Iowa Beef Processors, Inc. v. Illinois Cent. Gulf R.R. Co.*, 685 F.2d 255, 259 (8th Cir.1982). "The principle is firmly established that 'in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over.'" *Access Telecommunications v. Southwestern Bell Telephone Co.*, 137 F.3d 605, 608 (8th Cir. 1998)(quoting Far *East Conference v. United States*, 342 U.S. 570, 574, 72 S. Ct. 492, 494 (1952)). In addition to utilizing agency expertise, the doctrine of primary jurisdiction is intended to promote uniformity and consistency within the particular field of regulation. *Id*.

Congress granted to the FCC the authority to determine whether "all charges, practices,

classifications, and regulations" in connection with interstate communication are just and reasonable. *See* 47 U.S.C. § 201(b).  At issue in this case is whether the NECA's treatment of stock redemption distributions was just and reasonable, which clearly falls within the FCC's statutory authority.  Furthermore, the reasonableness of NECA's handling of the distributions raises questions regarding FCC policy which should be considered by the Commission in the interests of a uniform and expert administration of the Federal Communications Act.

### IV.  Conclusion

For the reasons stated, Defendant's motion to dismiss (docket entry #14) is granted on the ground that Plaintiff's claims are precluded under the filed-rate doctrine.  Pursuant to the judgment entered together with this order, this action is DISMISSED WITH PREJUDICE.

IT IS SO ORDERED THIS 3RD DAY OF APRIL, 2009.

/s/Susan Webber Wright

UNITED STATES DISTRICT JUDGE